UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————X

In re:                                                    Chapter 11

THEATRE ROW PHASE II ASSOCIATES,                          Case No.: 03-10134 (PCB)

Debtor.

——————————————————————X
——————————————————————X

Request of MADISON EQUITIES, LLC for Payment
of Administrative Expenses,                               Case No.: 03-10134 (PCB)

——————————————————————X

                    and

——————————————————————X


MADISON EQUITIES, LLC,

                              Plaintiff,                  Adversary Proceeding
-against-                                                 No.: 04-04718 (PCB)

WILLIAM J. CONDREN,
                              Defendant.
——————————————————————X


APPEARANCES:

HASS & GOTTLIEB
Attorneys for Madison Equities, LLC.
670 White Plains Road
Suite 121
Scarsdale, New York 10583
By:  Lawrence M. Gottlieb, Esq.

M. STUART GOLDBERG LLC
Attorneys for Madison Equities, LLC.
81 Main Street
Unit 205
White Plains, New York 10601
By:  Marc Stuart Goldberg, Esq.

1

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK, P.C.
Attorneys for Debtor
1345 Avenue of the Americas
New York, New York 10105
By:  Robert Leinwand, Esq.
       David Burger, Esq.

WITH COPY TO:

NEW YORK CITY LAW DEPARTMENT, OFFICE OF THE CORPORATION COUNSEL
Attorneys for the City of New York
100 Church Street
New York, New York 10007
Gabriela P. Cacucci, Esq.

<u>MEMORANDUM DECISION GRANTING MOTION TO DISMISS</u>

BEATTY, Prudence Carter, U.S.B.J.

Theatre Row Phase II Associates, the debtor (the "Debtor") in this confirmed Chapter 11

case, was formerly the owner of the entire city block in Manhattan located between 10th Avenue

and Dyer Avenue and bounded by 42nd Street on the north and 41st Street on the south  (the

"Property").  Pursuant to an order of the Court, the Debtor was authorized to sell the Property to

TRM Associates, L.L.C. ("TRM").  Following the sale of the Property and confirmation of a

Chapter 11 plan, Madison Equities, LLC ("Madison"), who had been negotiating for the

acquisition of the Property with the Debtor for many months prior to its sale to TRM, made a

motion seeking payment of over $20 million in administrative expense claims (the "Request").

Shortly after filing the Request, Madison commenced an adversary proceeding against William

2

J. Condren ("Condren"), the co-general partner of the Debtor.   The factual allegations in the

Request are identical to those made in the complaint in the adversary proceeding (the

"Complaint").[1]

In response to the Request and Complaint, the Debtor and Condren filed a joint Motion to

Dismiss.  For the reasons set forth below, the Court grants the Motion to Dismiss the Request

and the Complaint.

Statement of Facts[2]

1.    On January 10, 2003 (the "Filing Date") the Debtor filed a voluntary petition under

Chapter 11 of the United States Bankruptcy Code (the "Code").[3]  The Debtor is a New

York limited partnership.[4]

---

[1] Based on the court's reading of Madison's papers, the Complaint against Condren is duplicative of the Request against the Debtor, although the legal theories differ.

[2] The Statement of Facts incorporates by reference all of the factual allegations made in the Request (ECF No.161) and the Complaint (A.P. ECF No. 1), without, however, adopting any of the defined terms used in those documents.  The defined terms are merely conclusory and this court need not, and does not, accept them as true on this motion to dismiss.  Familiarity with the Request and the Complaint are presumed.  The Statement of Facts incorporates the most salient factual allegations for ease of reference.

[3]  All references to the Bankruptcy Code refer to the Bankruptcy Code as in effect prior to the changes made in mid-October 2005.

[4]  Dyer Avenue Local Development Corporation ("Dyer") was the only general partner other than Condren.  See ECF No. 27.  The Debtor commenced an adversary proceeding in mid-2003 against EHR Investments after EHR asserted that it had the right to control the limited partnership interests not owned by the general partners.  See A.P. 03-08926.  The amended complaint in that adversary proceeding stated at ¶ 20 that Condren owned 33.7060% of the limited partnership interests.  At ¶ 51 the amended complaint alleged the partnership agreement required the consent of 51% of the limited partners to any sale of the Property. Thus while Condren was both a general and limited partner of the Debtor, and its managing partner, he lacked the legal authority to dispose of the Property without the consent of others.  The proper identity of the other limited partners, who were all unrelated to Condren, was ultimately resolved

2.      As of the Filing Date the Debtor had been the ground lessee of the Property since the

early 1980's.  The Property is located in an area that was known as Theatre Row and was

one of various revitalization efforts of the City of New York undertaken in the early

1980's.[5]  The City of New York was the landlord under the Debtor's ground lease.  The

40-year ground lease contained the right to one 10-year renewal term as well as granting

the ground lessee the option to purchase the Property under certain circumstances for

$100,000.  The original ground lease transaction also involved the granting of several

mortgages that were unpaid at the Filing Date. There was a small mortgage of about

$450,000 held by the Ford Foundation.  In addition there were significantly more

substantial mortgages held by the City of New York's Economic Development

Corporation ("EDC") and the Department of Citywide Administrative Services

("DCAS") (hereafter together with the City of New York, the "City") that had been

granted as part of the original ground lease transaction.  EDC filed a proof of claim in the

amount for about $3.6 million.  DCAS filed a proof of claim in the amount for

approximately $7.7 million.

3.      Debtor's major source of income was from leasing out the old Westside Airlines terminal

located on a portion of the Property to various recording studios. [6]  Before the Filing

_____

amicably prior to confirmation of the Chapter 11 plan.

[5]  The revitalization efforts included the very successful redevelopment of the Times Square
area, which is just blocks east of the Property.

[6]  At the time of the filing of the Chapter 11 petition there were several small theatres on the
Property as well as a couple of restaurants in addition to the Westside Airlines Terminal.  The
Property is located immediately west of the Port Authority Bus Terminal, a major terminus for
commuter buses from New Jersey.

4

Date, the Debtor and the tenant of that building had a dispute that ultimately went to

arbitration over the rental due for a renewal term.  The Debtor also had other disputes

with the tenant over what it viewed as unlawful subleasing of certain of the leased space

by the tenant.  The arbitration award fixed a very substantially increased rental rate for

the renewal term.   Prior to the Filing Date, the tenant had ceased paying rent and had

moved out abruptly after the award was issued.   This left the Debtor without an adequate

source of income to meet its obligations under the ground lease and as well as on the

mortgages.

4.      Shortly after the Filing Date and on January 18, 2003, the Debtor filed an adversary

proceeding against the City seeking to have this court determine the proper calculation of

the interest due on to the City on one of the mortgages, which raised complex legal issues

and involved certain disputed facts.  See A.P. 03-02056.  In addition an action pending in

the state court, which involved the City's attempt to collect the unpaid rent on the ground

lease, was removed to the federal district court and referred to the bankruptcy court.  See

A.P. 03-02056.  Both these litigations were contentious.  See, e.g., Transcript 7/22/2004

(ECF No. 123).  In addition to the disputes over the mortgage and lease payments, the

City made numerous objections throughout the Chapter 11 case to such things as the

Debtor's request for extensions of time to file a Chapter 11 plan. [7]

---

[7] Nowhere in the Request or the Complaint does Madison acknowledge the significant litigation activity going on in the bankruptcy court in the Spring and Summer of 2004 involving the City claims and the Debtor.

5

5.      Realization of value from the Property sufficient to keep the ground lease payments

current and pay the mortgages was an overarching objective of the Chapter 11 case

because of the Debtor's illiquid state.   Although the Debtor valued its interest in the

Property on its schedules for an amount in excess of the amounts due on the outstanding

mortgages, it needed the protection of Chapter 11 and the automatic stay to achieve a

recovery satisfactory to its general and limited partners, as well as to deal with the City's

claims.

6.      From the Request and the Complaint it appears that in an effort to reach that goal, among

other things, the Debtor,  through Condren its managing partner, engaged in negotiations

with Madison over the terms of a possible ground lease for the Property from late 2002,

throughout 2003 and into Summer 2004.   The Request and Complaint contain much

detail about those negotiations.  Just less than a year after the Filing Date, Condren sent a

letter dated January 2, 2004 to Robert Gladstone ("Gladstone"), the managing member of

Madison.  Condren's January 2nd letter requested that Gladstone reconsider two

provisions of Madison's proposal, including the provision for the rent during the initial

term and the provision regarding rent during construction.[8]   The letter included the

following language:  "In consideration of the long and sustained effort you have already

invested in this project, you are entitled to and are getting a last look."  This so-called last

look language ("Last Look Language") is repeatedly referred to by Madison in the

---

[8]  At the time this letter was sent, the deal being negotiated was in the form of a ground lease,
not a sale.

6

Request and the Complaint.  Condren also advised Gladstone in the letter that he was "in receipt of another offer from another developer" for the Property.

7.     Madison and Condren continued to engage in negotiations after January 2004.  While Condren's co-partner, Dyer, had been content until around mid-April 2004 to allow Condren to move forward with his negotiations, at that time Dyer solicited or received a cash offer of $60 million for the purchase of the Property from the Brodsky Organization. Condren was opposed to the Brodsky offer.[9]  The City was also interested in the $60 million offer from the Brodsky Organization.  See ECF No. 106.

8.     In the Spring of 2004, the City began discussions with the Debtor over a proposal of the Metropolitan Transit Authority (the "MTA") to extend the No. 7 subway line from the Port Authority further West, which would include placement of subway exits on the Property as well as possible utilization of a portion of the Property as a staging area for the subway construction.  Madison was opposed to the placement of anything related to the subway on the Property.  Madison alleges that Condren supported Madison's opposition to the City's subway plans with respect to the Property.  Complaint ¶ 114. However, it is undisputed that in or about May 2004 Madison met directly with the City to discuss the subway issue in an attempt to resolve it satisfactorily.  Condren consented to the meetings but did not attend.   The City was seeking to reach an amicable but immediate agreement on the subway placement issues on the Property in the absence of which it was prepared to commence partial condemnation proceedings.  The extension of

_____

[9]  Under the terms of the partnership agreement, Dyer was entitled to a fixed payment and would have received no economic benefit from a higher offer.  See ECF No. 106, 108.

the subway over the Property was but one element of a larger development project for

other city-owned or controlled property located several blocks west of the Property.

9.    The negotiations between the Debtor and Madison reached their apparent culmination in

early August 2004 when a final draft ground lease between Madison and the Debtor was

circulated.  See Request ¶¶ 117-118.  Condren then advised Madison that, rather than a

ground lease, his partners were seeking to sell the Property.  See Request ¶ 120.  Madison

does not allege that the change in the nature of the transaction from a ground lease to a

sale was unacceptable to it.  According to Madison, Condren stated that he had a

purchase offer in hand from TRM of  $100 million plus an additional $2.5 million

payment to the City.  See Request ¶ 121.  The Request and Complaint detail further

statements alleged to have been made by Condren in which he in words or substance

agreed that Madison could have the deal at $105 million.  Complaint ¶ 122-123.

Thereafter Condren advised Madison that TRM had raised its offer to $107 million in

addition to certain amounts on the City Claims and it stated to have again agreed to allow

Madison a "last look".  Complaint ¶ 127.

10.   Madison states that it matched the TRM offer and Condren agreed they had a deal.

Complaint ¶ 128.  A ten-hour negotiation session occurred on August 11, 2004.

Complaint ¶ 130.  Following the negotiation session at approximately 1:37 a.m. on

August 13, 2004, a final execution copy of a purchase and sale agreement between

Madison and the Debtor was transmitted to both sides for final review.  It appears that

execution was expected to occur later in the day on August 13.  It is undisputed that the

agreement contained a provision that it would not to be effective unless and until it was signed. That agreement was never signed.

11. According to the Complaint, ¶¶ 134-5, Condren made representations to Gladstone on August 13 and August 14 that the agreement would be signed. On the evening of August 15, Condren advised Madison that the Debtor had entered into a deal for the sale of the Property with TRM on the evening of August 13. Complaint ¶ 137.[10] As part of the deal with TRM Condren stated that he had committed himself personally to a $10 million guaranty not to offer the deal to others and advised Madison that as a result he could no longer consider any further negotiations with Madison. Complaint ¶ 140.

12. The Debtor scheduled its Disclosure Statement hearing for September 22, 2004. ECF No. 126-127. The City filed an objection to the Debtor's Disclosure Statement. ECF No. 135. Attached to the City's objection was a document dated July 22, 2004 entitled "Binding Agreement" (the "Binding Agreement"). Neither the Court or Madison were aware of the Binding Agreement prior to its submission by the City. The Binding Agreement was entered into at a time when the Debtor was seeking an extension of the exclusive period to file its Chapter 11 plan. A key provision of the Binding Agreement was that it fixed the Debtor's final period for the extension of exclusivity as well as fixing the date by which confirmation had to occur, both issues of major concern to the City. In another key provision in the Binding Agreement, the City and TP42, a TRM entity, agreed to a payoff figure with respect the City mortgages as well as to a resolution

---

[10] Condren apparently advised Madison that the TRM deal was at a higher price that the price in the contract ultimately put before the court for approval. Complaint ¶¶ 138-9.

of the MTA No. 7 Line extension issues. [11]   However, although it was termed a Binding Agreement, there was nothing in the agreement which committed the Debtor to TP42 and so it was not binding in that regard.

13.    In mid September the Debtor gave notice of hearing for October 5, 2004 at which it would seek Court approval of the agreement with TRM.[12]  Two objections were filed. The City objected for several different reasons.  Prior to the hearing, the City resolved its issues and ultimately withdrew its objection.  Madison also filed an objection to the sale. Madison believed it had not been given a fair opportunity to bid and that it had in fact made a higher offer than TRM for the Property.

14.    The Court held a hearing on October 6, 2004 on the Debtor's application.  The court overruled Madison's objection for several reasons.  The court found *inter alia* that it was not necessary that there be a formal auction in a setting in which all creditors would be paid in full and that all of the partners, general and limited, had approved the transaction. Importantly the City was in favor of the transaction with TRM because it had reached an agreement with TRM on the subway issues.  The City was opposed to any transaction with Madison because Madison had been inflexible in its negotiations with the City and

---

[11] The Binding Agreement contained a provision stating that "the Debtor and the City shall advise the Court that they are attempting to reach agreement concerning a consensual plan without specifically identifying TP42."

[12]  While the sale agreement actually contained a provision for a break-up fee should TRM not end up as the final purchaser of the Property in addition to the Condren guaranty, the application submitted to the court did not provide for a bidding process.  Break-up fees require court approval and the application for approval of a sale that contains a break-up fee normally provides for a hearing for approval of the break-up fee prior to the hearing to approve the sale. See *In re Global Crossing Ltd.*, 295 B.R. 726, 742-43 (Bankr. S.D.N.Y. 2003).  However, here, court approval of the break-up fee was not sought prior to the sale hearing.

had never to come to an acceptable agreement with the City with respect to the extension

of the No. 7 subway line over part of the Property.   The court approved the TRM offer as

the best offer for the Property.  Transcript, 10/6/2004 (ECF No. 156).  Madison did not

take an appeal from the October 13, 2004 order approving the sale to TRM. Subsequent

to court approval the transaction with TRM closed and the Debtor received $103.2

million.  The amount received by the Debtor is sufficient to pay all claims, including

Madison's if allowed, as well as make a substantial distribution to the Debtor's general

and limited partners.

15.    The Debtor's Chapter 11 plan was confirmed on October 25, 2004.[13]

16.    Madison filed the Request after confirmation and on November 9, 2004.

17.    About a month after filing the Request, Madison commenced an adversary proceeding

against Condren as the Debtor's general partner.  The Complaint is identical to the

Request except that "Condren" is substituted for the "Debtor" and the legal theories

differ.  In addition, Madison asserts a punitive damage claim against Condren.

18.    There are two claims asserted by Madison in the Request and Complaint.  The first one is

for $18.2 million (the "Profit Claim").  Madison calculates the Profit Claim by claiming

it added $50 million to price of the Property.  This  $50 million is the alleged difference

between an all-cash bid the Debtor received from a third party and the final price paid by

TRM for the Property, discounted at an applied rate of 25%.    Request ¶167; ECF No.

176.

---

[13]  Dyer submitted a limited objection to confirmation of the plan. ECF No. 150.  Dyer did not
object to the transaction with TRM but it did object to any alternative, but undelineated plan,

19.     The second claim is one for $2.04 million based on the expenses Madison alleged it

        incurred in pursuing the acquisition of the Property.  The out of pocket expenses Madison

        alleges it incurred include fees paid to engineers, an architect, attorneys, consultants, $1

        million in overhead as well as certain miscellaneous fees. [14]

20.     On January 12, 2005, the Debtor and Condren filed a Motion to Dismiss the Request and

        the Complaint for failure to state legally cognizable claims.   Madison filed papers in

        opposition to the motion.


                                        Discussion

                            Standard for a Motion to Dismiss

       On this dual Motion to Dismiss, the Court must look to both Bankruptcy Rule 9114(c)

and Bankruptcy Rule 7012.  Rule 9014(c) states that the Court may direct the application of one

or more of the rules in Part VII which governs adversary proceedings, in addition to those listed

in Rule 9104 when determining contested matters.  No party has objected to the application of

Rule 7012 to the contested matter.

       Bankruptcy Rule 7012 makes Federal Rule of Civil Procedure ("FRCP") 12(b)(6)

applicable to adversary proceedings.  On a FRCP 12(b)(6) motion, "a court merely assesses the

legal feasibility of a complaint."  See *In re Bayou Group LLC*, 362 B.R. 624, 632 (Bankr.

_____

should the TRM transaction not close.

[14] Madison asserts for example, that among other things, it was induced to expend monies to
explore Condren's idea of building the mother of all garages on the Property, something
ultimately determined not to be feasible. See Complaint ¶¶ 30-37.   However at no point in its
lengthy narrative Request and Complaint does Madison state that it asked Condren personally or
on behalf of the Debtor to pay or contribute to Madison's concept development or other

                                            12

S.D.N.Y. 2007).  A court must "accept all factual allegations in the complaint as true."  See

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2509 (2007); accord *Bell Atlantic*

*Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007).

In order to avoid dismissal on a FRCP 12(b)(6) motion, a complaint must allege "enough

facts to state a claim to relief that is plausible on its face." See *Twombly* at 1974, or, put

otherwise, to "possess enough heft to 'show that the pleader is entitled to relief,'" *Id.* at 1966.

*Twombly* creates "a flexible 'plausibility standard' which obliges a pleader to amplify a claim

with some factual allegations in those contexts where such amplification is needed to render the

claim *plausible.*" See *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2d Cir. 2007) (emphasis in

original); See also *In re Musicland Holding Corp.*, 374 B.R. 113, 119 (Bankr. S.D.N.Y. 2007).

Courts "must consider the complaint in its entirety, as well as other sources courts

ordinarily examine when ruling on a Rule 12(b)(6) motions to dismiss, in particular, documents

incorporated in to the complaint by reference, and matters of which a court may take judicial

notice." See *Tellabs* at 2509.  Moreover, in deciding a FRCP 12(b)(6) motion the Court can look

to documents that were not incorporated to the complaint by reference but were integral to the

complaint.  See *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991), cert.*

*denied, 503 U.S. 960 (1992)* (the court considered documents that were attached to the motion to

dismiss because the debtor had notice of the facts contained within the documents and the debtor

relied on such facts in forming the complaint).  In a bankruptcy case, the court can take judicial

notice of all of the documents filed in the case although it must not make factual findings about

expenses.

13

disputed facts from those documents.  For example, it is a matter of record in this Chapter 11

case that there were three adversary proceedings filed (in addition to the one against Condren)

and the court can take note of the contents of the various pleadings in those adversary

proceedings, as well as pleadings and other documents in the case itself.

While on a motion to dismiss, well-pleaded allegations must be considered to be true

"conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice

to prevent a motion to dismiss" from being granted.[15]  See *Campbell v. San Antonio*, 43 F.3d

973, 975 (5th Cir. 1995) (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th

Circ. 1993)); see also *Fleming v. Lind-Waldock & Co.,* 922 F.2d 20, 23-24 (1st Cir. 1990).  This

Court will ignore as merely conclusory allegations the many definitions and compounded and

pyramided definitions used in the Request and the Complaint.  For example, the term "Last Look

Representation" is conclusory if it is intended to be more than a mere shorthand reference to

certain language in Condren's January 2nd letter.

---

[15]  In support of the motion to dismiss, an affidavit of Condren containing factual matters was
offered.  *See* ECF No. 174.  The court is excluding the facts offered and declining to convert the
motion to dismiss to one for summary judgment.  *See* FRCP 12(d).

Madison has submitted the affidavit of Lawrence M. Gottlieb to which is attached a copy of
the Complaint, excerpts from a deposition of Condren and a June 22, 2004 letter from Burger to
the court.  The letter to the court adds nothing not already in the record.  The deposition excerpts
contain nothing that assists Madison's position, although they do confirm that Condren was
willing to condone Burger's lack of candor with the court.  The Gottlieb affidavit, while
reviewed by the court, is therefore excluded for FRCP 12(d) purposes.

As more fully set forth below, neither the Request nor the Complaint can survive a motion to dismiss because even if all the facts are taken as true, the facts do not establish any claim or cause of action against the Debtor or Condren.

Madison's Profit Claim

Madison asserts two claims.  The first is the $18.2 million Profit Claim.   As against the Debtor the Profit Claim is asserted as an expense of administration.  The Profit Claim is also made against Condren as the Debtor's managing general partner but it is based on a legal theory of common law fraud.

Administrative expenses are created by transactions entered into by the debtor-in-possession in the ordinary course of business during the course of a Chapter 11 case.  Under the standard set forth in Code §503(b)(1), administrative expenses are the "actual, necessary costs and expenses of preserving the estate."  The Code §503(b)(1) test insures that there will be "some judicial control over the determination of what [] contract will be granted administrative expense priority."  See *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25 (2nd Cir. 1996).  Normally expenses of administration arise from acts that are beneficial to the estate.  See *In re New York Trap Rock Corp.*, 137 B.R. 568, 572 (Bankr. S.D.N.Y. 1992).  However it has been established since the Supreme Court's decision in *Reading v. Brown*, 391 U.S. 471 (1968), that administration expenses can also be allowed for acts done in the administration of the estate that do not benefit the estate but which harm non-debtors.  An allowable claim for an expense of administration must have a satisfactory basis in law other than Code § 503(a)(1), such as contract or tort, as well as factual validity.

15

As more fully detailed below, this court concludes that Madison does not have an allowable administration expense claim for the Profit Claim, whether the claim is viewed either as one for a benefit imposed on the Debtor or a detriment incurred by Madison.  Madison fails because it cannot show the necessary contractual (or tort) basis on which to impose liability despite Madison's valiant pleading efforts in conflating the Last Look Language definition.  This is not a case in which there was a preliminary written agreement between the Debtor and Madison but no final agreement was reached.  See *Teachers Insurance and Annuity Association v. Tribune Co.,* 670 F. Supp. 491, 499 (S.D.N.Y. 1987).[16]   The Last Look Language was contained in a letter that referred to another bidder as well as indicating that certain terms proposed by Madison were not acceptable to the Debtor.  The Last Look Language was a gratuitous gesture. There are not even details that indicate how and when the last look was to be provided.  Certainly it was too vague to constitute a right of first refusal. [17]   In addition the deal morphed in Summer 2004 from a ground lease into a sale.    There is no question but that the Debtor was courting Madison, but it was also courting others as it told Madison.  Madison was chasing what proved to be a fickle seller.

---

[16]   In determining whether there is intent to be bound, the Court must consider "(1) the language of the [written] agreement; (2) the context of negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form."  See *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir. 1989) (*citing Teachers* at 499-503).

[17]   Under the New York Statute of Frauds, NYGOL §5-703(2),  "A contract for the leasing for a longer period than one year, or for the sale, of any real property*** is void unless the contract or some note or memorandum thereof, expressing consideration, is in writing, subscribed by the party to be charged."  While this court reaches its decision on other grounds, it seems unlikely that any of the various writing that Madison has invoked would qualify as a "writing" under the New York State of Frauds.

16

Madison was aware that the Debtor was in bankruptcy and that the Property was the sole asset of the Debtor. It cannot be disputed that the sole asset of a Chapter 11 debtor cannot be sold without court approval. See Code § 363(b)(1) and (c)(1). In fact, a Chapter 11 debtor cannot enter into a binding contract to sell its sole asset without approval from the bankruptcy court.[18] In the end, Madison is nothing more or less than a disappointed prospective buyer.

The Complaint, although factually identical to the Request, seeks relief against Condren based on a different legal theory, i.e., common law fraud.[19] Madison does not fare better by recasting its Profit Claim as one against Condren for common law fraud. Fraud must be pled with particularity under Bankruptcy Rule 9 incorporating FRCP 9(b). The Complaint is pled

---

[18] Under the Code, it was not necessary for Condren as the managing general partner of the Debtor to obtain authority from the bankruptcy court to engage in negotiations for the sale or lease of the Property. In that respect his authority derived from the partnership agreement and partnership law.

[19] In addition Madison seeks punitive damages. It cannot recover on punitive damages on either of the two claims. To recover punitive damages there must be a wrong against the public interest. If the harm is solely against a private interest, punitive damages are not available. See *Edison v. Viva Intern., Ltd.*, 70 A.D.2d 379 (1st Dep't 1979). Madison has failed to plead any facts, and the Court is unable to imagine any facts it could plead, that would indicate harm to the public interest. The only interest harmed, if any, is the private interest of Madison. Punitive damages are punishment and are intended to deter similar conduct to that of the defendant's in a particular case. See *Adelman v. Adelman*, 741 N.Y.S.2d 841 (2002). If no valid underlying claim exists for which compensatory damages could be recovered, then no claim for punitive damages can stand. See *Prote Contracting Col, Inc. v. Board of Educ. Of City of New York*, 276 A.D.2d 309 (1st Dep't 2000). To recover punitive damages related to an underlying tort claim, one must assert actual malice. See *300 West Realty Co. v. City of New York*, 57 A.D.2d 805 (1st Dep't 1977). Since this Court finds that no claim exists against Condren for common law fraud, it is evident that Madison has not plead any facts sufficient to show actual malice. Generally, punitive damages are not available when the underlying claim sounds in contract. Punitive damages can be recoverable for breach of contract, only if there is a showing of gross, wanton or willful fraud of the defendant. See *Reinah Development Corp. v. Kaaterskill Hotel Corp.*, 59 N.Y.2d 482 (1983). No contract existed between Madison and the Debtor and therefore there is no underlying claim for which to support punitive damages.

17

with great particularity. Indeed it contains 157 detailed paragraphs and is twenty-five pages long.

A cause of action for common law fraud requires that the plaintiff prove (1) there was false representation or omission of a material fact, (2) it justifiably relied on that representation, (3) the representation was intentionally made to induce the plaintiff to rely and (4) there was an actual injury as a result of such reliance. See *Lama Holdings Co. v. Smith Barney*, Inc., 88 N.Y.2d 413, 421 (1996) (citing *Channel Master Corp. V. Aluminum Ltd. Sales*, 4 N.Y.2d 403 (1958); See also *New York University v. Continental Ins. Co.*, 87 N.Y. 2d 308, 318 (1995)). All of the factors must be satisfied.

However, despite the particularity with which it plead, unfortunately for Madison, the allegations of the Complaint simply fail to add up to a strong inference of fraudulent intent.[20] There is nothing in the Complaint from which *any* inference can be drawn that at the outset the negotiations with Madison in 2002 or at the time the Last Look Language letter was sent that Condren had a definite intention *not* to enter into a deal with Madison. Without that Madison cannot prove that Condren made a misrepresentation of fact on which to base an action for

---

[20]  The plaintiff must plead "'facts that give rise to a strong inference of fraudulent intent.'" See *In re AlphaStar Ins. Group Ltd.*, 2008 WL 435494, at *15 (Bankr. S.D.N.Y)(quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); See also *Serova v. Teplen*, 2006 WL 349624, at *8 (S.D.N.Y. 2006). 'Strong inference of fraudulent intent' requires the pleader to establish facts that either (1) "show that defendant[] had both motive and opportunity to commit fraud", or (2) show "strong circumstantial evidence of conscience misbehavior or recklessness." *Id*. Rule 9(b) requires more than facts that a reasonable person could infer shows a fraudulent intent; rather the 'strong' inference required must be cogent. See *Tellabs* at 2510. The court must consider both the inferences put forth by the Plaintiff and any rational competing inferences. *Id*. "'A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" See *AlphaStar*, 2008 WL 435494, at *15 (quoting *Tellabs* at 2509-10).

common law fraud.  All of Madison's painstaking pleading efforts to compound various events

that occurred in 2004 into one grand misrepresentation of intent by Condren also fail.  They fail

because Madison has acknowledged that it is a sophisticated developer in the New York

metropolitan area.  Many of the supposed representations were equivocal.  In other instances

Madison had the means to determine the true facts.  For example, the disputes with the City were

recorded on both the case docket and the dockets in the two adversary proceedings with the City

and discussed in open court at many hearings.  Surely Madison did not need the Debtor through

Condren to tell it that the City would play a large role in the resolution of the Chapter 11 case or

that the Debtor could not afford the time or expense of litigating with the City over the subway

issues before disposing of its interest in the Property.  Nor indeed it is reasonable to think that

any developer would want the Debtor to negotiate with the City over where the subway was to

be placed since the placement would affect the developer, not the Debtor.

The adversary proceeding with EHR contained information about who the partners were

and made clear that Condren did not hold the majority equity interest in the partnership.  When

at the end of May 2004 Madison became concerned about Condren's authority because of

objections made by Dyer, Madison was willing to rely on a mealy mouthed letter from the

Debtor's attorney that admitted that Dyer had a voice as general partner until it was paid an

agreed amount.  Complaint ¶¶ 92-95; Complaint, Exhibit F.  Given that the Debtor had no

known source of funds to pay Dyer off without a sale of the Property and could not have done so

without Court approval, the letter as much as said that Condren's authority was constrained.

Madison has not pleaded any facts that suggest any reason whatsoever why it should

have been considered to be a superior bidder under any and all circumstances.   When the

19

transaction was in the form of a ground lease as it was at the time of the Debtor's initial

discussions with Madison, the Debtor and its partners would have borne credit and other risks

over the almost century term of the ground lease then under discussion.  However, with an

outright sale, the credit risk would evaporate upon closing.  There were no doubt tax and other

considerations that the Debtor's limited and general partners needed to carefully weigh in

deciding whether they preferred a sale or a long-term lease.

This Court has already heard and overruled Madison's objection to the sale to TRM.

The Second Circuit has stated that "[t]he rule we adopt requires that a judge determining a §

363(b) application expressly find from the evidence presented before him at the hearing a good

business reason to grant such an application."  See *In re Ionosphere Clubs, Inc. And Easter Air

Lines, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989), quoting *In re Lionel Corp.*, 722 F.2d

1063, 1071 (2d Cir. 1983); § 363(b)(1) (requiring court approval for a sale outside the ordinary

course of business).   The best offer is not solely a function of dollars and includes in its analysis

other factors.  The City filed an objection to the Debtor's assumption and assignment of its

leasehold interest in the Property on a number of legal and factual grounds.  Given the paltry

option price in light of the substantial increase in value of the Property in the years since and the

unresolved issues of the amounts due on the mortgages, the Debtor had a strong economic

incentive to favor a buyer who was satisfactory to the City.   One of the issues of importance to

the City was the extension of the No. 7 train over a portion of the Property.  The City was simply

not satisfied with Madison's approach to the No. 7 line extension.   Madison and its attorneys

must be charged with understanding the factual and legal environment in which its negotiations

with Condren occurred since Madison is in the business of investigating, bidding on and

20

negotiating development opportunities.  It cannot successfully claim to be rube taken advantage
of by a city slicker.

<u>The $2.04 Million Claims</u>

Madison's second claim is in the amount of $2.04 million (the "Expenses Claim"). The
over $2 million requested is based on the "actual costs and expenses incurred by Madison
Equities in securing, for the benefit of the Debtor, the Madison Equities Enhancement."  Request
¶159.  The same claim is asserted against Condren for failure to negotiate in good faith.[21]  The
claim against Condren may be summarily dismissed because under New York law a necessary
predicate for a failure to negotiate in good faith claim is the existence of an enforceable
agreement or an agreement to contract.[22]  New York contract law does not recognize a duty of
good faith in formation of a contract.  See *Frutico S.A. de C.V. v. Bankers Trust Co.*, 833 F.Supp.
288, 300 (S.D.N.Y. 1993) ("[W]hen no agreement exists, either in principle or in fact, there is no
duty to negotiate in good faith that can be enforced against a party to the negotiations").  A good
faith duty only exists in a party's performance or enforcement of a contract.  See *In re 50 Pine
Co., LLC v. CapitalSource Finance LLC*, 317 B.R. 276, 283 (Bankr. S.D.N.Y. 2004) ("While a
covenant of good faith is implied in every contract, the existence of an underlying contractual
obligation is presupposed.").

---

[21]  At no point in the Complaint does Madison allege that the Debtor partnership is insolvent.
This is not a mere pleading failure since it is clear that the amount received by the Debtor from
the sale of the Property is more than enough to pay all creditors, including Madison if its were
allowable.  In the absence of insolvency a general partner's joint liability for partnership debts is
merely theoretical.  This alone would be a sufficient reason to grant the motion to dismiss the
Complaint against Condren.

[22]  Madison alleges that the Last Look Language shows a binding agreement or a binding
preliminary agreement.  As analyzed above under the rubric of *Teachers*, this allegation is

21

With respect to the Expenses Claim, Madison fairs no better in its attempt to recover this amount from the Debtor because the Expenses Claim lacks a legal underpinning.  The Last Look Language was contained in a letter that explicitly stated that Condren was negotiating with others.  Madison knew it was not the only bidder on the horizon for the Property.  There was no way that that Madison could make a bid for the Property without assessing its development prospects in order to determine whether it even wanted to bid and at what price.  The Debtor never agreed with Madison to pay or reimburse Madison for any of its expenses in pursuing a deal for the Property.  Nor could the Debtor have agreed to do so without court approval since any such contract would not have been in the ordinary course of business.  Naming the expenses the "Madison Equities Enhancement" does not convert what was a business expenditure made by Madison into an obligation of the Debtor.

Numerous paragraphs in the Request detail the discussions between the Debtor, Madison and its specialists, such as attorneys and architects, about a proposed development plan for the Property.  The worst that can be said is that the Debtor through Condren simply took advantage of Madison's willingness to proceed to incur expenses and to disclose its plans without there being any binding commitment, preliminary or otherwise, or agreement for expense reimbursement.  Even though Madison would like this Court to believe that it is unusual, there is nothing unusual about a potential buyer engaging in due diligence and formulating a plan of development when they look to acquire a piece of real estate.   Madison appears to be stating that the fact that they made a higher bid for the Property than another bidder in some way shows that they enhanced the value of the Property.   However, Madison had no contractual rights to the

unfounded.

22

Property or to the value of any supposed enhancement to the value of the Property that might

have come about as a result of its own voluntarily made expenditures and disclosure of its

development concepts.

<u>Conclusion</u>

For the foregoing reasons, this Court grants the Motion to Dismiss as to both the Debtor

and Condren.

The Court is signing separate orders dismissing the Adversary Proceeding and the

Request of Payment of Administrative Expenses.

Dated: New York, New York
       April 11, 2008

<u>/s/ Prudence Carter Beatty</u>
U.S.B.J.

23